IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | | |
|---|---|---|
| DONALD JONES | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | Case No. 4:12-cv-11-AGF-SPM |
| | ) | |
| | ) | |
| MICHAEL J. ASTRUE, | ) | |
| | ) | |
| Commissioner of Social Security, | ) | |
| | ) | |
| Defendant. | ) | |

**REPORT AND RECOMMENDATION
OF UNITED STATES MAGISTRATE JUDGE**

This is an action under 42 U.S.C. § 405(g) for judicial review of the final decision of

Defendant Michael J. Astrue, the Commissioner of Social Security, denying the application of

Plaintiff Donald Jones for disability insurance benefits under Title II of the Social Security Act,

42 U.S.C. §§ 401 *et seq.* (the "Act"). This matter was referred to the undersigned United States

Magistrate Judge for review and a recommended disposition pursuant to 28 U.S.C. § 636(b).

The undersigned recommends that the decision of the Commissioner be affirmed.

**I.       PROCEDURAL HISTORY**

Plaintiff filed his application for benefits under Tile II of the Act on February 5, 2009,

claiming disability because of scoliosis, seizures, a heart condition, anxiety, and high blood

pressure, with an alleged onset date of February 1, 2008.[1]  (Tr. 183-86, 209).  Plaintiff's

---

[1] There is some conflicting evidence in the record regarding Plaintiff's alleged onset date. In his
application for benefits and in his brief before this court, Plaintiff alleged an onset date of

application was denied initially. (Tr. 88). A hearing was held before Robert G. O'Blennis, an Administrative Law Judge ("ALJ") on August 26, 2010. (Tr. 30-75). Following the hearing, on January 6, 2011, the ALJ found that Plaintiff was not under a "disability" as defined in the Act. (Tr. 12-29). On November 23, 2011, the Appeals Council of the Social Security Administration denied Plaintiff's request for review. (Tr. 1-7). Thus, the ALJ's decision stands as the final decision of the Commissioner.

In appealing the Commissioner's decision, Plaintiff argues (1) that the ALJ failed to properly consider opinion evidence from Plaintiff's treating physician, Andrew Ninichuck, M.D., and from consultative examiner Barry Burchett, M.D.; and (2) that the ALJ failed to properly consider the combination of all of Plaintiff's severe medically determinable impairments by not finding any severe mental impairments at Step Two of the analysis.

## II.     FACTUAL BACKGROUND

### A. BACKGROUND

Plaintiff testified to the following at a hearing before the ALJ on August 26, 2010. (Tr. 32-57). Plaintiff was born on February 4, 1964. He has an eighth grade education and has no GED or vocational training. (Tr. 34). He has a driver's license but does not drive based upon doctor's orders. (Tr. 35, 54). He lives with his wife. (Tr. 35). At home, Plaintiff's wife is with him all the time. (Tr. 47). Plaintiff watches television and talks on the phone with relatives. (Tr. 44-45). His adult children do the household chores. (Tr. 45).

---

February 1, 2008. (Tr. 183, Pl.'s Br. at 7). However, in his Disability Report – Adult, and again in his testimony before the ALJ, Plaintiff alleged an onset date of October 31, 2005. (Tr. 37, 209). The undersigned has reviewed the medical evidence dated between 2005 and 2008. However, like the parties, the undersigned focuses primarily on the records dated in 2008 and later.

Plaintiff last worked in 2004 or 2005 as a dishwasher in a restaurant. (Tr. 35). Prior to that, he worked at temporary agencies doing labor jobs; at a resort driving around and picking up bundles of laundry; at a company loading large metal parts onto a machine and bolting them down; and at a company unloading trucks on the docks. (Tr. 36-37).

Plaintiff testified that he became disabled as of October 31, 2005, because of bad back problems. (Tr. 37). He takes hydrocodone, tramadol, and prescription ibuprofen, and in the past he has taken Darvocet. (Tr. 37-38). He also takes carisoprodol for muscle spasms in his back. (Tr. 39). Plaintiff has never had surgery or shots on his back. (Tr. 46). He also takes alprazolam, Seroquel, amitriptyline, and paroxetine for anxiety, depression, and sleep problems. (Tr. 39-40). He also takes Combivent, Fluticasone, ProAir, and albuterol for chronic obstructive pulmonary disease (COPD) or emphysema. (Tr. 40). Some of his medications cause tiredness, dizziness, and lightheadedness. (Tr. 43). He has fallen asleep during a conversation recently. (Tr. 44).

Plaintiff testified that he has had seizures for about three years, for which he takes Dilantin. (Tr. 39). He gets seizures about once every six months, even while taking his medications. (Tr. 39, 50). He testified that he will be sitting and will wake up someplace else with no memory of what happened, sore all over. (Tr. 50).

Plaintiff testified that his medications help somewhat with his depression. He has not been hospitalized for depression or for his back in the last couple of years. (Tr. 40). However, he has been hospitalized for chest pains and was diagnosed with a weak, enlarged heart. He was taking medication for that condition but can no longer afford it. (Tr. 41).

Plaintiff can stand for about 10 or 20 minutes before needing to rest and can stand for about 30 to 40 minutes in an eight-hour day. He sits in a tilted position because his back does

not hurt as much when he does so. (Tr. 51). When he is sitting in a regular, straight-back chair, he can sit and maintain focus for about 10 to 20 minutes. He can maintain focus, attention, and concentration in a seated position for 30-40 minutes of an eight-hour work day. (Tr. 52). Plaintiff testified that it would be difficult for him to pick something up off of the floor, that he has trouble tying his shoes because it hurts to bend over, and that he has problems going up or down steps. (Tr. 46, 53). About five to eight days a month, he has days so bad that he is essentially bed bound. (Tr. 53).

Plaintiff has anxiety attacks about three or four times a month in which he shakes, he feels cold and clammy, his heart is racing, his chest hurts, and he feels like he is dying. When this happens, he blows into a paper bag. It takes 30 minutes to an hour for his symptoms to be controlled. (Tr. 54).

Plaintiff smokes cigarettes but has gone down from a pack a day to three cigarettes per day. (Tr. 47). He has an oxygen apparatus prescribed by his family doctor, Dr. Ninichuck; he has had it for about a year. (Tr. 45-46). He has a portable oxygen container to use when he leaves the house, and he has a different type of oxygen delivery system for use at home. He is always connected to it when he is at home. He has been on oxygen during the day for about a year and during the night for about a year and a half. (Tr. 48). He appeared at the hearing before the ALJ with supplemental oxygen. (Tr. 21).

### B. MEDICAL TREATMENT

Records dated prior to Plaintiff's alleged onset date of February 1, 2008, show a history of scoliosis, low back pain, leg pain, hip/groin pain, anxiety, depression, hypertension, insomnia, chest pain, wheezing, seizures, COPD, congestive heart failure, and shortness of breath. (Tr. 284, 304-05, 311, 326, 329-36, 385, 387, 403).

On April 18, 2008, Plaintiff was assessed as having chest wall pain, COPD, and hypertension. (Tr. 337). On July 18, 2008, he was assessed as having anxiety. (Tr. 338). Plaintiff's respiratory and psychiatric examinations were normal at both visits, and no cardiovascular problems were noted. (Tr. 337-38).

On November 14, 2008, Dr. Andrew Ninichuck assessed Plaintiff as having hypertension, anxiety, COPD, and some other conditions that are not legible.[2] Plaintiff's respiratory, cardiovascular, and psychiatric examinations were noted to be normal. (Tr. 339).

On December 1, 2008, Plaintiff presented at the emergency department, stating that he was breathing but was not getting any oxygen. (Tr. 356). He was observed to be in mild to moderate respiratory distress. On respiratory exam, there was wheezing in all lobes, his breath sounds were equal, and his respiration was mildly to moderately labored at rest. (Tr. 357). A chest X-ray showed thoracic dextroscoliosis but no acute cardiopulmonary disease. (Tr. 313). After one breathing treatment, his wheezing was 90% improved. (Tr. 359). He was prescribed Cipro and prednisone and told to use his inhaler every three to four hours as needed. (Tr. 360).

On December 7, 2008, Plaintiff reported to the emergency room because he had injured his right foot. (Tr. 289). His breath sounds, cardiovascular condition, and psychiatric condition were noted to be within normal limits. (Tr. 290). A chest X-ray done the same day revealed "no

---

[2] Plaintiff's brief and Defendant's brief are inconsistent with respect to which physician authored some of Plaintiff's treatment records. *See* Def's Br. at 4-5 (describing records at Tr. 555-62 as Dr. Ninichuck's treatment records); Pl's Br. at 3-5 (describing records at Tr. 555-59 and 561 as Dr. Kelly Hartel's treatment notes). Few of the notes themselves contain any legible indication of the treatment provider who made them. However, notes identified as Dr. Ninichuck's by both parties (Tr. 628) appear to contain the same handwriting and signature as the notes at transcript pages 339, 555-58, and 560-62. In addition, Dr. Ninichuck stated in his opinion that he first saw Plaintiff on November 14, 2008, the record of which is at transcript page 339. (Tr. 604). Thus, the undersigned considers notes from pages 339, 555-58, and 560-62 to be those of Dr. Ninichuck. However, the undersigned's recommendation would not change if some or all of these notes were authored by someone other than Dr. Ninichuck.

evidence of active pulmonary disease," clear lungs, normal heart size, and scoliosis of the thoracolumbar spine. (Tr. 295). It was noted that Plaintiff had longstanding and disabling back pain, and he was advised to go to the scoliosis clinic for evaluation and treatment. (Tr. 296).

At a doctor visit on December 9, 2008, Plaintiff's psychiatric condition was noted to be normal. On respiratory examination, some wheezing was apparently present, but notes are difficult to read. (Tr. 340).

On January 23, 2009, Plaintiff presented to the emergency department having had a seizure. (Tr. 344). On examination, his respiratory, cardiovascular, and psychiatric conditions were unremarkable. (Tr. 345). A head CT showed no acute infarction, mass, mass effect, or hemorrhage. (Tr. 317). A chest X-ray showed "results unchanged since 12/01/2008." (Tr. 320). He was prescribed Dilantin and advised to follow up with a neurologist. (Tr. 347).

A January 30, 2009 respiratory examination showed a few scattered wheezes. (Tr. 545).

On February 2, 2009, Plaintiff saw Dr. Akel, who noted that Plaintiff had congestive heart failure; hypertension, controlled; continued tobacco abuse; and anxiety. Dr. Akel noted that Plaintiff needed to be on a beta blocker and ACE inhibitor. (Tr. 601).

On February 4, 2009, Plaintiff saw Julia Zevallos, M.D. for seizures. (Tr. 399). A review of symptoms showed shortness of breath, limb pain, memory problems, seizures, depression, and anxiety. His gait was normal. He was diagnosed with localization-related (focal) (partial) epilepsy and epileptic syndromes with complex partial seizures, with intractable epilepsy. He was told that he could not drive until he had been seizure-free for six months. (Tr. 401).

On February 6, 2009, Dr. Ninichuck's treatment notes indicate that Plaintiff was complaining of lower back pain shooting down his legs. Plaintiff was noted to have arthralgia,

myalgia, lower back pain with radiculopathy; anxiety, stable; COPD, stable; and seizure disorder; stable.  His respiratory, psychiatric, musculoskeletal, and cardiovascular examinations were normal.  These notes are difficult to read but appear to state, "LSpine PE" with some "+" symbols nearby.  (Tr. 560).

On February 18, 2009, Dr. Ninichuck noted that Plaintiff had arthralgia, myalgia, anxiety, COPD, and seizure disorder.  Respiratory, cardiovascular, and psychiatric examinations were normal.  (Tr. 562).

On February 19, 2009, Plaintiff had an echocardiogram that showed an ejection fraction of 65-70%.  (Tr. 407-08).  The left ventricular evaluation showed normal size, wall thickness, and global systolic function, and no regional wall motion abnormalities.  The results were otherwise unremarkable.  (Tr. 407).  A dual isotope stress test was negative for inducible myocardial ischemia at 86% of his predicted maximum heart rate for age; showed a normal blood pressure response to exercise; showed a fair exercise tolerance for age; was negative for complaints of chest pain during exercise; and showed a normal left ventricular size and function with an ejection fraction of 59%.  (Tr. 409).

On March 16, 2009, Plaintiff presented to the emergency room complaining of an "anxiety attack" after a "shouting match" with his son.  (Tr. 530-31, 534).  He was shaking.  (Tr. 531, 534).  His respiratory examination was normal, with "no wheeze."  It was noted that he was already on Xanax, Seroquel, and Paxil.  (Tr. 532).  It was noted that he had had another anxiety attack about one year ago.  (Tr. 531).  He was diagnosed with "anxiety reaction."  (Tr. 532).  At discharge, he was given instructions regarding anxiety, and it was suggested that he live apart from his son.  (Tr. 542).

On May 15, 2009, Dr. Ninichuck indicated that Plaintiff complained of joint pain in his elbows and stated that he had difficulty lifting things. His cardiovascular, musculoskeletal, respiratory, and psychiatric examinations were normal. He was noted to have hypertension, stable; anxiety, stable; COPD, stable; seizure disorder, stable; and some other illegible conditions. (Tr. 561).

On May 23, 2009, Plaintiff presented to the emergency department with abdominal pain and distention. He reported no cardiovascular or respiratory symptoms. (Tr. 492).

On May 27, 2009, Plaintiff presented at the emergency department with stomach pains. (Tr. 469). His respiratory, musculoskeletal, and cardiovascular examinations were normal. (Tr. 469-70).

On July 14, 2009, a lumbar spine X-ray showed "no radiographic abnormality" in Plaintiff's lumbar spine. (Tr. 467).

On August 4, 2009, Plaintiff went to the emergency department complaining of chronic low back pain that had begun to radiate down both legs. He denied shortness of breath or chest pain. His respiratory and cardiac examinations were normal. (Tr. 452). He was diagnosed with back pain and sciatica. (Tr. 454).

On August 7, 2009, a doctor's notes indicate that Plaintiff had ongoing back problems; COPD, sciatica, arthralgia, myalgia, and seizure disorder. His $SPO_2$ was 91%.[3] Wheezing was noted. Plaintiff's cardiovascular and psychiatric examinations were normal. (Tr. 559).

On August 11, 2009, Lincare, Inc. provided Dr. Ninichuck with an oximetry report, described as "overnight oximetry on room air." (Tr. 585-96). The duration of the test was

---

[3] $SPO_2$ is an indication of oxygen saturation measured via pulse oximetry.
http://www.medilexicon.com/medicalabbreviations.php.

approximately seven and a half hours. The $SPO_2$ ranged from 82% to 97%, with a mean $SPO_2$ of 89%. The longest continuous time with saturation less than 89% was seven minutes. There were 25 desaturation events of over three minutes' duration, and 42 desaturation events of less than three minutes' duration. (Tr. 585).

On August 24, 2009, Plaintiff returned to Dr. Akel. (Tr. 427-28). Dr. Akel noted that Plaintiff had stopped taking most of his medication. He found the patient in no respiratory distress and with a pleasant mood and appropriate affect. He noted that Plaintiff complains of dyspnea on exertion with moderate activity and no chest pain. (Tr. 427). He assessed Plaintiff as having medical noncompliance, congestive heart failure with improved left ventricular systolic function to normal on cardiac echo in February 2009, COPD, obstructive sleep apnea, and continued tobacco abuse. (Tr. 428).

On September 2, 2009, Dr. Ninichuck noted that Plaintiff had arthralgia, myalgia, and lower back pain with radiculopathy. Plaintiff's psychiatric examination was normal. Dr. Ninichuck's notes are difficult to read but state, "LSpine E" and contain some "+" symbols. It was noted that Plaintiff should have a lumbar spine MRI. (Tr. 557).

On September 8, 2009, a lumbar spine MRI showed mild multilevel degenerative disc and facet disease without significant focal herniation or stenosis. (Tr. 528).

On October 21, 2009, Plaintiff presented to the emergency department with fever, chest congestion, cough, and headache. (Tr. 518-19). It was noted that he had anxiety. (Tr. 519). His medication sheet states, "$O_2$ at night." (Tr. 522). His respiratory, cardiovascular, and psychiatric examinations were normal. (Tr. 524).

On November 19, 2009, Plaintiff presented to the emergency room with difficulty breathing. He indicated that his shortness of breath was helped by taking off his oxygen and

putting it back on. (Tr. 429). On examination, he had scattered wheezes, but his respiration was nonlabored. Cardiovascular, psychiatric, and musculoskeletal examinations were unremarkable. (Tr. 430). An electrocardiogram report was normal. (Tr. 433). A chest X-ray showed scoliosis and "no active lung disease." (Tr. 436). His discharge diagnosis was exacerbation COPD. (Tr. 435).

On February 10, 2010, Dr. Ninichuck's notes indicate that Plaintiff was using Ultram and Soma for back pain and that Ultram did not seem to help but that Soma helped some. It was noted that Plaintiff's stress and anxiety had increased since his daughter had moved back in, and that Plaintiff was taking Xanax and Paxil. It was noted that he had been on them for ten years and that they were not working as well as they once did. Plaintiff was assessed as having hypertension; anxiety; COPD, seizure disorder; cognitive impairment; lower back pain with radiculopathy, scoliosis, depression, arthralgia, and myalgia. Notes state, "[illegible] $O_2$ [illegible] day." (Tr. 556).

On February 18, 2010, Lincare, Inc. provided an oximetry report to Dr. Ninichuck. (Tr. 573-81). The duration of the test was just over three minutes. The $SPO_2$ ranged from 85% to 95%, with a mean $SPO_2$ of 90.7%. (Tr. 573).

On April 18, 2010, Plaintiff presented to the emergency room with a cough. (Tr. 507-08). Respiratory wheezes were observed. (Tr. 514). It was noted that Plaintiff used oxygen at home at night. (Tr. 512). Cardiovascular, musculoskeletal, and psychiatric examinations were normal. (Tr. 514).

On May 12, 2010, Dr. Ninichuck's notes indicate that Plaintiff had back pain. Plaintiff's respiratory, cardiovascular, musculoskeletal, and psychiatric examinations were normal. He was assessed as having hypertension, stable; anxiety, stable; COPD, stable; seizure disorder, stable;

cognitive impairment; lower back pain with radiculopathy; depression; arthralgia; and myalgia. (Tr. 555).

On August 11, 2010, Plaintiff reported to Dr. Ninichuck that Paxil was "working well." His respiratory, cardiovascular, and psychiatric examinations were normal. Dr. Ninichuck noted anxiety, COPD, seizure disorder, low back pain, and depression. (Tr. 628).

An overnight pulse oximetry test on room air was performed September 20-21, 2010, for approximately ten hours, at the request of Dr. Ninichuck. (Tr. 621-26). Plaintiff's $SPO_2$ ranged from 73% to 96%, with an average of 90.2%. The longest continuous period with desaturation less than 88% lasted four minutes and 40 seconds. (Tr. 621).

On September 16, 2010, Plaintiff saw Dr. Chaganti for a psychiatric examination. (Tr. 632-33). Plaintiff reported that he had anxiety attacks occurring about once per week. He reported that he had never been seen by a psychiatrist or been hospitalized for psychiatric reasons and that he had been treated with Xanax and Paxil. He also complained of mood swings and feelings of helplessness and worthlessness. (Tr. 632). Dr. Chaganti diagnosed major depressive disorder and increased his Xanax and Paxil dosages. She assigned Plaintiff a Global Assessment of Functioning (GAF) score of 55.[4] (Tr. 633). No cognitive impairment was noted. (Tr. 632-33).

---

[4] The Global Assessment of Functioning Scale (GAF) is a psychological assessment tool wherein an examiner is to "[c]onsider psychological, social, and occupational functioning on a hypothetical continuum of mental health-illness"; it does "not include impairment in functioning due to physical (or environmental) limitations." *Diagnostic and Statistical Manual of Mental Disorders (DSM-IV)*, 32 (4th ed. 1994). A GAF of 51-60 indicates "[m]oderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) OR moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflicts with peers or co-workers)." *DSM-IV* 32.

On September 24, 2010, Dr. Ninichuck noted expiratory wheezing bilaterally and wrote "$O_2$ as ordered." (Tr. 627).

On October 14, 2010, Plaintiff returned to Dr. Chaganti for follow up. He reported being "OK I guess" and discussed sleep problems and racing thoughts at night. He reported conflicts with his daughter. He was observed to have a flat affect. It was noted that he had started taking trazodone. His response to treatment was "partial," and his side effects were "none." No cognitive impairment was discussed. (Tr. 634).

## C. OPINION EVIDENCE AND CONSULTATIVE EXAMINATIONS

### 1. PSYCHIATRIC REVIEW TECHNIQUE FORM OF MARSHA TOLL, PSY.D.

On March 24, 2009, Marsha Toll, Psy.D., a nonexamining state psychologist, opined that Plaintiff's mental impairments of anxiety and depression were not severe. (Tr. 410-20). She noted that medical evidence supported a diagnosis of anxiety, but not depression; that Plaintiff had been treated for anxiety; that his psych evaluations were generally normal without significant limitations; and that Plaintiff had not sought counseling and had not been hospitalized for a mental impairment. She found Plaintiff's statements regarding his mental impairments minimally credible as they were not supported by the medical evidence. (Tr. 420).

### 2. FUNCTIONAL CAPACITY ASSESSMENT OF ANDREW NINICHUCK, M.D. – AUGUST 24, 2010

On August 24, 2010, Dr. Ninichuck completed a functional capacity assessment form for Plaintiff. (Tr. 603-04). He indicated that Plaintiff had low back pain with radiculopathy; a cognitive impairment; COPD requiring oxygen; congestive heart failure class III; seizure disorder; scoliosis; anxiety; and depression. (Tr. 603). He opined that Plaintiff could stand/walk for five minutes at a time and for 30 minutes total in an eight-hour workday; could sit for 10 minutes at a time and for 45 minutes total in an eight-hour workday; could carry less than 10

pounds frequently; could not bend, squat, or stoop; required continuous oxygen; had no exercise tolerance; could only walk for fewer than 25 feet without rest; and could not focus or concentrate on any mental task due to his cognitive impairment. (Tr. 603-04). He opined that Plaintiff could not work at a sedentary level because he could only sit for five minute at a time and could not focus or concentrate on any task. He stated that he had first seen Plaintiff on November 14, 2008. (Tr. 604).

### 3. *CONSULTATIVE EXAMINATION OF BARRY BURCHETT, M.D. – OCTOBER 1, 2010*

On October 1, 2010, Dr. Barry Burchett completed a consultative examination of Plaintiff. (Tr. 607). He noted that Plaintiff reported that he used oxygen at nighttime and p.r.n. (as required) during the day and that Plaintiff had not brought oxygen with him. (Tr. 608-09).[5] Dr. Burchett found that Plaintiff ambulated with a normal gait; that he appeared stable and comfortable in the supine and sitting positions; that his appearance, mood, orientation, and thinking seemed appropriate; and that his recent and remote memory for medical events was good. Dr. Burchett found moderate bilateral wheezing and diminished breath sounds, and he noted that Plaintiff seemed mildly to moderately short of breath with the limited exertion required for the examination. His cardiovascular examination was normal. (Tr. 609). Examination of the dorsolumbar spine revealed normal curvature. The straight leg raise test was positive bilaterally in the supine position at 80 degrees. Plaintiff could stand on one leg at a time with no difficulty, could walk on the heels and toes, and could perform tandem gait and squat without difficulty. Dr. Burchett's impression was grand mal seizure disorder; chronic low back pain, without radiculopathy; emphysema/COPD, history of congestive heart failure and chest

---

[5] Plaintiff subsequently filed a statement indicating that he did bring his oxygen to the appointment but ran out while in the waiting room. Plaintiff sent his son to the car to get more, but Plaintiff was called into the examination room while his son was gone and so went in without it. (Tr. 267).

pain; and hypertension. (Tr. 610). He found moderate limitation of voluntary lumbar flexion. There were no motor or sensory abnormalities in the lower extremities, and Plaintiff's lower extremity muscle strength was 5/5 on both sides. (Tr. 611). Plaintiff's finger squeeze score was 5/5, and his range of motion in the upper extremities was normal. (Tr. 611-12).

Dr. Burchett completed a Medical Source Statement for Plaintiff. (Tr. 614-19). He opined that Plaintiff could lift or carry up to ten pounds occasionally and could never lift or carry more due to his general weakness and dyspnea; could sit for two hours at a time and eight hours in an eight-hour workday; could stand for one hour at a time and two hours in an eight-hour workday; and could walk for 15 minutes at a time and 30 minutes in an eight-hour workday. (Tr. 614-15). He opined that Plaintiff could occasionally reach overhead; could frequently reach in other ways; could occasionally handle and push/pull; could continuously finger and feel; and could frequently operate foot controls. (Tr. 616). He opined that Plaintiff could continuously balance but could never climb stairs, ramps, ladders, or scaffolds and could never stoop, kneel, crouch, or crawl because of his positive straight leg raise and dyspnea. (Tr. 617). He found that due to Plaintiff's seizures, Plaintiff could never tolerate unprotected heights, moving mechanical parts, or operating a motor vehicle. He found that due to Plaintiff's COPD, he could never tolerate dust, odors, fumes, or pulmonary irritants; extreme cold or heat; or vibrations. (Tr. 618).

### D. VOCATIONAL EVIDENCE

Vocational Expert ("VE") James Israel testified at the hearing before the ALJ. (Tr. 57-72). The VE testified that in the past fifteen years, Plaintiff had performed factory assembly work, unskilled medium; dish washing, unskilled, medium; and various temporary labor and other related material handling jobs, also unskilled, medium. (Tr. 58).

The ALJ posed the following hypothetical to the VE:

[L]et's assume, hypothetically, that an individual of Mr. Jones' age, education and work experience could lift 20 pounds on occasion and 10 pounds frequently. He could . . . stand and/or walk about six hour [sic] in an eight hour work day . . . and sit at least six. . . . And that the person should avoid climbing latters [sic], ropes and scaffolds and could only occasionally balance, stoop, kneel, crouch and crawl, balance at height, stoop, kneel, crouch and crawl and occasionally climb ramps and stairs and that the person should avoid concentrate [sic] exposure to extreme cold and heat, humidity, noxious fumes, odors, dust and gases and should not work at unprotected dangerous heights and around unprotected dangerous machinery or alone around open water or flame.

(Tr. 58-59). The VE testified that such an individual could not perform Plaintiff's past jobs as performed. (Tr. 59). However, he stated that such an individual could perform light sorter jobs (2,100 jobs statewide); assembly production jobs avoiding the elements (2,700 jobs), and packer and wrapper positions (1,600 jobs). (Tr. 59-60). Those were the reduced numbers to accommodate limitations with respect to the elements. (Tr. 60).

The ALJ then asked the VE whether there would be jobs that could be performed if the exertional level were reduced to sedentary, with a maximum lift of 10 pounds and a maximum stand and/or walk of about two hours in an eight-hour work day. The VE testified that there would be different assembly jobs (1,200 jobs); product inspector; checker examiner (950 jobs statewide); and unskilled cashier jobs that could be seated three quarters of the day (4,500 jobs statewide). (Tr. 60).

The VE testified that those job numbers would not be reduced if a person needed to stand up briefly to stretch for comfort and then get back to work, but that there could be a substantial reduction in the number of jobs if the time away increased by even a few minutes. (Tr. 61).

The VE testified that if the person would consistently miss more than two days of work a month or would have to show up late or get additional break time once a week at a random time, that would preclude sustained employment in these jobs. (Tr. 61).

The VE testified that if the individual were restricted to simple and/or repetitive work that did not require close interaction with the public or coworkers, the cashier job would be eliminated but the other jobs would remain.  (Tr. 62).

The VE testified that having a portable oxygen tank would significantly compromise the number of jobs such an individual could do because the individual could not be around an open flame or temperature extremes, because of workplace disruption, and because of possible functional limitations.  (Tr. 68-69).  He testified that having to refill the oxygen tank for ten minutes at one or two prescheduled times would not necessarily preclude activity but would require work accommodation that in many cases would not be afforded.  (Tr. 71).  If the timing of the changes were irregular, however, employers would not tolerate it.  (Tr. 72).

Upon questioning by Plaintiff's counsel, the VE testified that an individual with the limitations identified by Dr. Ninichuck would not be able to do any jobs.  (Tr. 63).  He also testified that a person of Plaintiff's age, education, and work experience who could lift no more than 10 pounds, could sit for no more than an hour out of an eight-hour work day, could stand no more than about an hour out of a work day, were restricted in stooping, bending, picking things up off the floor, and "things required of the back manipulation"; and were required to be on oxygen, there would be no jobs available.  (Tr. 64).

The VE also testified that an individual who was restricted to sedentary work and who could maintain the posture of sitting but could only maintain focus or attention for about 30 to 40 minutes in that position, at which point they would be work dysfunctional for about ten minutes, there would be no jobs.  (Tr. 64-66).

The VE also testified that seizures every six months or so in which a person loses consciousness for a period of time would be work disruptive but would not necessarily preclude

work in all situations. (Tr. 66-67). The VE testified that if an individual had episodes of anxiety three to four times a month that required the employee to leave the work station and breathe into a paper bag to calm down, no jobs would be available. (Tr. 67-68).

## III.   DECISION OF THE ALJ

The ALJ found that Plaintiff last met the insured requirements of the Act on September 30, 2010; that Plaintiff did not engage in substantial gainful activity during the period from his alleged onset date through his date last insured of September 30, 2010; and that Plaintiff had the following severe impairments: chronic obstructive pulmonary disease, hypertension, seizure disorder, degenerative disc disease of the lumbar spine, and history of congestive heart failure. (Tr. 17). He found that the evidence did not establish the presence of a severe, medically determinable and diagnosed mental impairment. The ALJ also found that Plaintiff did not have an impairment or combination of impairments that met or medically equaled one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1. (Tr. 20).

The ALJ found that Plaintiff had the residual functional capacity to perform sedentary work as defined in 20 C.F.R. § 404.1567(a)[6] except for lifting or carrying more than 10 pounds occasionally and less weight frequently; standing or walking more than 2 hours in an 8-hour workday; sitting more than six hours in an eight-hour workday; climbing ladders, ropes, or scaffolds; climbing ramps or stairs, balancing at heights, stooping, kneeling, crouching, or crawling more than occasionally; concentrated exposure to extreme heat, cold humidity, noxious

---

[6] "Sedentary work involves lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools. Although a sedentary job is defined as one which involves sitting, a certain amount of walking and standing is often necessary in carrying out job duties. Jobs are sedentary if walking and standing are required occasionally and other sedentary criteria are met." 20 C.F.R. § 404.1567(a)

fumes, odors, dust, gases, etc.; and exposure to unprotected heights, dangerous machinery, or open water or flame. (Tr. 20-21).

The ALJ found that Plaintiff was unable to perform his past relevant work. Relying on the testimony of the VE, the ALJ found that there were jobs that existed in significant numbers in the national economy that Plaintiff could perform. (Tr. 24). Therefore, he found that Plaintiff was not under a disability through the date last insured. (Tr. 25).

## IV. GENERAL LEGAL PRINCIPLES

The court's role in reviewing the Commissioner's decision is to determine whether the decision "'complies with the relevant legal requirements and is supported by substantial evidence in the record as a whole.'" *Pate-Fires v. Astrue*, 564 F.3d 935, 942 (8th Cir. 2009) (quoting *Ford v. Astrue*, 518 F.3d 979, 981 (8th Cir. 2008)). "Substantial evidence is 'less than preponderance, but enough that a reasonable mind might accept it as adequate to support a conclusion.'" *Renstrom v. Astrue*, 680 F.3d 1057, 1063 (8th Cir. 2012) (quoting *Moore v. Astrue*, 572 F.3d 520, 522 (8th Cir. 2009)). In determining whether substantial evidence supports the Commissioner's decision, the court considers both evidence that supports that decision and evidence that detracts from that decision. *Id.* However, the court "'do[es] not reweigh the evidence presented to the ALJ, and [it] defer[s] to the ALJ's determinations regarding the credibility of testimony, as long as those determinations are supported by good reasons and substantial evidence.'" *Id.* (quoting *Gonzales v. Barnhart*, 465 F.3d 890, 894 (8th Cir. 2006)). "If, after reviewing the record, the court finds it is possible to draw two inconsistent positions from the evidence and one of those positions represents the ALJ's findings, the court must affirm the ALJ's decision.'" *Partee v. Astrue*, 638 F.3d 860, 863 (8th Cir. 2011) (quoting *Goff v. Barnhart*, 421 F.3d 785, 789 (8th Cir. 2005)).

The Social Security Act defines as disabled a person who is "unable to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. § 1382c(a)(3)(A); *see also Hurd v. Astrue*, 621 F.3d 734, 738 (8th Cir. 2010). The impairment must be "of such severity that [the claimant] is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work." 42 U.S.C. § 1382c(a)(3)(B).

A five-step regulatory framework is used to determine whether an individual claimant qualifies for disability benefits. 20 C.F.R. § 404.1520(a); *see also McCoy v. Astrue*, 648 F.3d 605, 611 (8th Cir. 2011) (discussing the five-step process). At Step One, the ALJ determines whether the claimant is currently engaging in "substantial gainful activity"; if so, then he is not disabled. 20 C.F.R. §§ 404.1520(a)(4)(i); *McCoy*, 648 F.3d at 611. At Step Two, the ALJ determines whether the claimant has a severe impairment, which is "any impairment or combination of impairments which significantly limits [the claimant's] physical or mental ability to do basic work activities"; if the claimant does not have a severe impairment, he is not disabled. 20 C.F.R. §§ 404.1520(a)(4)(ii), 404.1520(c); *McCoy*, 648 F.3d at 611. At Step Three, the ALJ evaluates whether the claimant's impairment meets or equals one of the impairments listed in 20 C.F.R. Part 404, Subpart P, Appendix 1 (the "listings"). 20 C.F.R. § 404.1520(a)(4)(iii). If the claimant has such an impairment, the Commissioner will find the

claimant disabled; if not, the ALJ proceeds with the rest of the five-step process. 20 C.F.R. § 404.1520(d); *McCoy*, 648 F.3d at 611.

Prior to Step Four, the ALJ must assess the claimant's "residual functional capacity" ("RFC"), which is "the most a claimant can do despite [his] limitations." *Moore v. Astrue*, 572 F.3d 520, 523 (8th Cir. 2009) (citing 20 C.F.R. § 404.1545(a)(1)); *see also* 20 C.F.R. § 404.1520(e). At Step Four, the ALJ determines whether the claimant can return to his past relevant work, by comparing the claimant's RFC with the physical and mental demands of the claimant's past relevant work. 20 C.F.R. §§ 404.1520(a)(4)(iv), 404.1520(f); *McCoy*, 648 F.3d at 611. If the claimant can perform his past relevant work, he is not disabled; if the claimant cannot, the analysis proceeds to the next step. *Id.* At Step Five, the ALJ considers the claimant's RFC, age, education, and work experience to determine whether the claimant can make an adjustment to other work in the national economy; if the claimant cannot make an adjustment to other work, the claimant will be found disabled. 20 C.F.R. § 404.1520(a)(4)(v); *McCoy*, 648 F.3d at 611.

Through Step Four, the burden remains with the claimant to prove that he is disabled. *Moore*, 572 F.3d at 523. At Step Five, the burden shifts to the Commissioner to establish that the claimant maintains the RFC to perform a significant number of jobs within the national economy. *Id.*; *Brock v. Astrue*, 674 F.3d 1062, 1064 (8th Cir. 2012).

## V.    DISCUSSION

The primary issues to be resolved are (i) whether the ALJ gave insufficient weight to the opinions of the physicians who treated or examined Plaintiff; and (ii) whether the ALJ erred by failing to consider anxiety, depression, and cognitive impairments as severe medically determinable impairments.

## A.   THE ALJ'S CONSIDERATION OF OPINION EVIDENCE

### 1.   OPINION OF PLAINTIFF'S TREATING PHYSICIAN, ANDREW NINICHUCK, M.D.

Plaintiff first argues that the ALJ should have given significant, if not controlling, weight to the opinions of Plaintiff's treating physician, Dr. Ninichuck.  "A treating physician's opinion is given controlling weight if it 'is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [a claimant's] case record.'"  *Tilley v. Astrue*, 580 F.3d 675, 679 (8th Cir. 2009) (quoting 20 C.F.R. § 404.1527(d)(2)).   However, "[w]hen a treating physician's opinions are inconsistent or contrary to the medical evidence as a whole, they are entitled to less weight."  *Halverson v. Astrue*, 600 F.3d 922, 929-30 (8th Cir. 2010) (internal quotation marks omitted).

"'When an ALJ discounts a treating physician's opinion, he should give good reasons for doing so.'"  *Martise v. Astrue*, 641 F.3d 909, 925 (8th Cir. 2011) (quoting *Davidson v. Astrue*, 501 F.3d 987, 990 (8th Cir. 2007)).   When an opinion is not given controlling weight as the opinion of a treating source, the weight given to the opinion depends on a number of factors, including whether the source has examined the claimant, the nature and extent of the treatment relationship, the relevant evidence provided in support of the opinion, the consistency of the opinion with the record as a whole, whether the opinion is related to the source's area of specialty, and other factors.  20 C.F.R. §§ 404.1527(c).

On August 24, 2010, Dr. Ninichuck opined that Plaintiff could stand/walk for five minutes continuously and for 30 minutes total in an eight-hour work day; could sit 10 minutes continuously and 45 minutes total in an eight-hour work day; could lift and carry less than 10 pounds occasionally; could walk less than 25 feet; could not bend, squat, or stoop; required continuous oxygen; had no exercise tolerance; and could not focus or concentrate on any task

due to his cognitive impairment. (Tr. 603-04). Dr. Ninichuck concluded that Plaintiff was unable to perform sedentary work. (Tr. 604). The ALJ granted "little weight" to Dr. Ninichuck's opinion, finding that he did not articulate an objective medical basis for the extreme limitations indicated and that his opinion was inconsistent with Dr. Ninichuck's own medical treatment records and the conservative treatment rendered, as well as with the other objective medical evidence of record. (Tr. 22-23).

The undersigned finds that the ALJ gave legally sufficient reasons for his decision to grant little weight to Dr. Ninichuck's opinion, and that his decision to do so was supported by substantial evidence, because Dr. Ninichuck's opined limitations were inconsistent with his own treatment notes and the other medical evidence.

First, as the ALJ found, although there is medical evidence that Plaintiff had back pain and scoliosis, the medical evidence as a whole is inconsistent with the extreme limitations on Plaintiff's ability to sit, stand, walk, lift, carry, and otherwise move that are outlined in Dr. Ninichuck's opinion. Some of Dr. Ninichuck's own musculoskeletal examinations of Plaintiff from 2009 and 2010 indicated a normal strength and range of motion (Tr. 555, 560), and a September 2009 lumbar spine MRI ordered by Dr. Ninichuck showed only mild degenerative disc and facet disease without significant focal herniation or stenosis. (Tr. 528). Many musculoskeletal examinations by others were also normal. (Tr. 429-30, 469-70, 514, 524). In addition, a July 2009 lumbar spine X-ray showed "no radiographic abnormality." (Tr. 467). As the ALJ noted, Plaintiff has received only conservative treatment for his back problems; he has never had surgery or shots on his back. (Tr. 23, 46). In addition, when Dr. Burchett examined Plaintiff in October 2010, although Dr. Burchett observed a positive straight leg test and some moderate range of motion limitations, Dr. Burchett stated that Plaintiff appeared "comfortable"

in the sitting and supine positions; observed a normal curvature of the dorsolumbar spine; found Plaintiff ambulated with a normal gait; found Plaintiff could stand on one leg at a time with no difficulty; found Plaintiff could walk on his heels and toes and perform tandem gait and squat without difficulty; found no significant tenderness or spasm in the back; found no motor or sensory abnormalities; and found a normal range of motion in the lower extremities. (Tr. 609-13).

Second, treatment notes of Dr. Ninichuck and others do not contain significant cardiovascular findings that would support the opined limitations. Most of Dr. Ninichuck's cardiovascular examinations of Plaintiff were normal, and most of his notes are devoid of any discussion of cardiovascular complaints. (Tr. 339, 555, 560-62, 628). Similarly, cardiovascular examinations performed by others in 2009 and 2010 were nearly all normal or unremarkable. (Tr. 345, 452, 469-70, 492, 514, 524, 559, 628). In addition, a December 2008 X-ray showed a normal heart size, and a November 2009 electrocardiogram was normal. (Tr. 295, 431, 433). An examination by Dr. Akel in February 2009 noted a normal blood pressure response to exercise; fair exercise tolerance for age; no chest pain during exercise; and a normal left ventricular size and function. (Tr. 407-09). An electrocardiogram in November 2009 was normal. (Tr. 435).

Third, as the ALJ noted, the treatment notes of Dr. Ninichuck and others with respect to Plaintiff's respiratory function are also inconsistent with the opined limitations and with Dr. Ninichuck's statement that Plaintiff requires continuous supplemental oxygen. Although Plaintiff sometimes complained of respiratory distress or shortness of breath and Plaintiff's doctors sometimes observed wheezing (Tr. 545, 356-67, 559, 429, 514, 609), Dr. Ninichuck's own respiratory examinations were frequently normal in 2008, 2009, and 2010. (Tr. 339, 555, 560, 562, 628). Consistent with those findings, in February 2009, May 2009, and May 2010, Dr.

Ninichuck noted that Plaintiff's COPD was "stable." (Tr. 555, 560, 561). Respiratory examinations performed by others were also frequently normal. (Tr. 290, 337-38, 345, 532, 492, 469-70, 452, 524). In addition, chest X-rays in December 2008 and November 2009 showed no evidence of active lung disease (Tr. 295, 361, 436). Also, as the ALJ properly noted, there is no indication in the treatment notes of Dr. Ninichuck or others that Plaintiff required continuous oxygen. (Tr. 23). On September 24, 2010, Dr. Ninichuck wrote, "$O_2$ as ordered," but he did not indicate that it was ordered continuously. (Tr. 627). To the contrary, on October 1, 2010 (after the date of Dr. Ninichuck's functional capacity assessment), Dr. Burchett noted that Plaintiff reported using oxygen at nighttime and "p.r.n." (as required) during the day. (Tr. 608). In addition, on April 18, 2010, emergency room notes indicate that Plaintiff used oxygen "at night," contrary to Plaintiff's testimony that he had been using oxygen during the day for a about a year as of the August 2010 hearing before the ALJ. (Tr. 48, 512). Finally, as the ALJ noted, Plaintiff's treatment notes do not indicate that he was using supplemental oxygen at his examinations, which undermines Dr. Ninichuck's suggestion that Plaintiff requires continuous oxygen. (Tr. 22).

Dr. Ninichuck's opinion that Plaintiff could not focus or concentrate on any task due to his cognitive impairment is also inconsistent with other evidence in the record. Although Dr. Ninichuck sometimes noted that Plaintiff had "anxiety" or a "cognitive impairment," there is nothing in his notes to suggest that he ever conducted an assessment of Plaintiff's cognitive abilities, nor is there evidence elsewhere in the record that would support the conclusion that Plaintiff was unable to focus or concentrate on any task. Moreover, Plaintiff's psychiatrist did not note a cognitive impairment or inability to focus or concentrate, and the consultative

examiner found that Plaintiff's "recent and remote memory for medical events is good" and that his "mood, orientation, and thinking seem appropriate." (Tr. 609, 632-34).

The ALJ also properly noted that Plaintiff's limitations appear to be based on Plaintiff's subjective complaints rather than on independent medical findings, which was a proper consideration. (Tr. 23). *See Kirby v. Astrue*, 500 F.3d 705, 709 (8th Cir. 2007) (holding that an ALJ was entitled to give less weight to a treating physician's opinion that "was based largely on [the claimant's] subjective complaints rather than on objective medical evidence.").

In addition, the ALJ properly considered the fact that most of Dr. Ninichuck's opinions were given by circling options on a preprinted form and contained little indication of the objective medical evidence supporting them. (Tr. 23). *See Wildman v. Astrue*, 596 F.3d 959, 964 (8th Cir. 2010) (finding that an ALJ properly discounted an opinion in part because it was conclusory, consisted of checklist forms, cited no medical evidence, and provided little to no elaboration); *Holmstrom v. Massanari*, 270 F.3d 715, 721 (8th Cir. 2001) (noting that the checklist format of an RFC assessment limited its evidentiary value); SSR 06-03p (noting that the factors to be considered in weighing an opinion include "the degree to which the source presents relevant evidence to support an opinion" and "how well the source explains the opinion").

In sum, the ALJ was not required to give weight Dr. Ninichuck's opinions that were unsupported by his own treatment notes and were inconsistent with his treatment notes and other substantial evidence in the record. *See Juszcyk v. Astrue*, 542 F.3d 626, 632 (8th Cir. 2008) ("ALJs are not obliged to defer to treating physician's medical opinions unless they are 'well-supported by medically acceptable clinical and laboratory diagnostic techniques and are not inconsistent with the other substantial evidence in the record.'") (quoting *Ellis v. Barnhart*, 392

F.3d 988, 995 (8th Cir. 2005)); *Wildman v. Astrue* 596 F.3d 959, 964 (8th Cir. 2010) (finding

that the ALJ properly discounted a treating physician's opinion that was conclusory, cited no

medical evidence, and provided little to no elaboration); *Davidson v. Astrue*, 578 F.3d 838, 843

(8th Cir. 2009) (stating, "It is permissible for an ALJ to discount an opinion of a treating

physician that is inconsistent with the physician's clinical treatment notes," and affirming the

ALJ's decision in part because the treating physician's treatment notes "contain[ed] few hints of

the serious physical limitations [the doctor] would later attribute to [the plaintiff].").

The undersigned rejects Plaintiff's argument that the ALJ failed in his duty to develop the

record with respect to Dr. Ninichuck's opinions. The ALJ "bears a responsibility to develop the

record fairly and fully, independent of the claimant's burden to press his case." *Snead v.

Barnhart*, 360 F.3d 834, 838 (8th Cir. 2004). However, reversal due to failure to develop the

record is only warranted where such failure was unfair or prejudicial. *Ellis v. Barnhart*, 392 F.3d

988, 994 (8th Cir. 2005).

Plaintiff first argues that the ALJ failed to develop the record because he did not

determine the meaning of illegible notes from Dr. Ninichuck on July 6, 2009, and September 2,

2009, that appear to relate to "LSpine PE" and contain some plus signs. (Tr. 557, 560). The

undersigned first notes that "the ALJ is not required to seek additional clarifying statements from

a treating physician unless a crucial issue is undeveloped." *Goff v. Barnhart*, 421 F.3d 785, 791

(8th Cir. 2005) (internal quotation marks omitted). Here, the illegible notes on two pages of

Plaintiff's large record of medical treatment do not demonstrate that any crucial issue was

undeveloped. As discussed above, the record contains numerous musculoskeletal examinations

and multiple radiographic reports related to Plaintiff's lumbar spine, as well as a recent

consultative examination that addressed Plaintiff's back and mobility issues. There is no

indication that the ALJ was unable to assess Plaintiff's back issues. Thus, the ALJ did not fail to develop the record with respect to Plaintiff's back issues. *See id.* at 791 (rejecting the plaintiff's argument that the ALJ had failed to develop the record with respect to treating physicians' opinions and emphasizing that the ALJ properly discounted the opinions because they were inconsistent with other substantial evidence in the record); *Shackleford v. Astrue*, No. 4:10-CV-2175 AGF, 2012 WL 918864, at *11 (E.D. Mo. Mar. 19, 2012) (rejecting the argument that the ALJ failed to satisfy his obligation to develop the record by seeking clarification of a treating doctor's illegible entries; reasoning that the ALJ had given good reasons for giving little weight to the doctor's opinion, including the disparity between the doctor's opinion and the medical evidence in the record as a whole).

Plaintiff also asserts that the ALJ erred by failing to develop the record regarding the significance of oximetry tests performed on Plaintiff in February 2009, August 2009, and September 2010. The undersigned finds no error. The ALJ reviewed many records related to Plaintiff's respiratory condition throughout the alleged period of disability, including chest X-rays, physicians' respiratory examinations, and records specifically addressing Plaintiff's need for and use of supplemental oxygen. (Tr. 17-19). Moreover, the oximetry reports cited by Plaintiff do not appear to suggest that Plaintiff's respiratory condition worsened after the dates of the records the ALJ discussed: Plaintiff's mean $SPO_2$ was 89% on the August 2009 test, 90.7% on the February 2010 test, and 90.2% on the September 2010 test. (Tr. 573, 585, 621). In addition, on the overnight test in August 2009, Plaintiff's longest continuous time with saturation less than 89% was seven minutes; and on the overnight test in September 2010, the longest continuous period with saturation less than 88% was less than five minutes. (Tr. 585, 621). The

undersigned finds no prejudice or unfairness that would warrant remand based on the ALJ's failure to determine the significance of these tests.

### 2. *OPINION OF CONSULTATIVE EXAMINER BARRY BURCHETT, M.D.*

Plaintiff next argues that the ALJ erred by ignoring certain parts of Dr. Burchett's opinion. In deciding whether a claimant is disabled, the ALJ considers medical opinions along with "the rest of the relevant evidence" in the record. 20 C.F.R. § 404.1527(b). "The ALJ may reject the conclusions of any medical expert, whether hired by the claimant or the government, if they are inconsistent with the record as a whole.'" *Wagner v. Astrue,* 499 F.3d 842, 848 (quoting *Pearsall v. Massanari*, 274 F.3d 122, 1219 (8th Cir. 2011)).

The undersigned finds no error in the ALJ's consideration of Dr. Burchett's opinion. The undersigned first notes that the ALJ did give "significant weight" to Dr. Burchett's opinions and relied in large part on those opinions in restricting Plaintiff to sedentary work. (Tr. 23). However, he explained that he was giving no weight to the parts of the opinion suggesting more than sedentary limitations. (Tr. 23). He properly found Dr. Burchett's opined limitations on Plaintiff's ability to sit, stand, and walk only partially credible because of Dr. Burchett's mild or moderate examination findings and the normal to moderate objective medical findings in Plaintiff's treatment records with respect to Plaintiff's musculoskeletal, cardiovascular, and respiratory conditions (discussed above). He properly found Dr. Burchett's opined limitations on Plaintiff's pushing, pulling, reaching, and handling ability to be only partially credible because Dr. Burchett's physical examination indicated no evidence of upper extremity or grip weakness, upper extremity range of motion, or other limitations, nor did the record as a whole show a medically determinable and diagnosed impairment affecting the upper extremities. (Tr. 23). An

ALJ may assign a medical opinion reduced weight where, as here, it is inconsistent with other evidence in the record. *Davidson v. Astrue*, 501 F.3d 987, 991 (8th Cir. 2007).

In sum, the undersigned finds that the ALJ's evaluation of opinion evidence was legally sufficient and was supported by substantial evidence. "If substantial evidence supports the ALJ's decision, we will not reverse it merely because substantial evidence would have supported a contrary outcome or because we might have decided the case differently in the first instance." *Howe v. Astrue*, 499 F.3d 835, 839 (8th Cir. 2007). *See also Bradley v. Astrue*, 528 F.3d 1113, 1115 (8th Cir. 2008) ("We will not disturb the denial of benefits so long as the ALJ's decision falls within the available zone of choice. An ALJ's decision is not outside the zone of choice simply because we might have reached a different conclusion had we been the initial finder of fact.").

### B. THE ALJ'S CONSIDERATION OF ANXIETY, DEPRESSION, AND COGNITIVE IMPAIRMENTS AS SEVERE IMPAIRMENTS

Plaintiff argues that the ALJ failed to consider Plaintiff's anxiety, depression, and cognitive impairments as severe medically determinable impairments. To show that an impairment is severe, a claimant must show that he has (1) a medically determinable impairment or combination of impairments, which (2) significantly limits his physical or mental ability to perform basic work activities, without regard to age, education, or work experience. *See* 20 C.F.R. §§ 404.1520(a)(4)(ii), (c); 404.1521(a). "An impairment is not severe if it amounts only to a slight abnormality that would not significantly limit the claimant's physical or mental ability to do basic work activities." *Kirby v. Astrue*, 500 F.3d 705, 707 (8th Cir. 2007). Basic work activities include, among other things, understanding, carrying out, and remembering simple instructions; use of judgment; responding appropriately to supervision, co-workers, and unusual work situations; and dealing with changes in a routine work setting. 20 C.F.R. §§ 404.1521(b).

Although the requirement of severity is not an "onerous requirement," it is "not a toothless standard." *Kirby*, 500 F.3d at 707.

Here, the ALJ properly found, and the record indicates, that Plaintiff's anxiety and depression were treated, stable, and controlled with medication, and they did not impose more than mild limitations on his ability to perform work activities. (Tr. 20). Throughout most of the alleged period of disability, Plaintiff's medical records do not address his mental impairments in any detail; rather, they typically simply note that Plaintiff had "anxiety." (Tr. 330, 338-39, 518, 555, 560-62, 601, 628). In addition, at many of his doctor visits in 2008 through 2010, his doctors circled "normal" or "WNL" (within normal limits) on the psychiatric examination section of their treatment notes and did *not* circle the "anxious" or "depressed" options. (Tr. 290, 337-40, 524, 555, 557, 559-62, 628). Some notes from 2009 and 2010 state that Plaintiff's anxiety was "stable." (Tr. 555, 560-61). On August 11, 2010, Plaintiff reported that his medication for his mental impairment was "working well." (Tr. 628). The small number of records that do contain more detail about Plaintiff's anxiety tend to suggest that the anxiety is brought on by family stressors; they do not necessarily suggest that Plaintiff's anxiety would significantly limit Plaintiff's ability to do work activities. (Tr. 530-31, 534, 556, 634).

In addition, there is no evidence that Plaintiff sought counseling or other treatment from a mental health professional until September 2010—after the hearing before the ALJ, and a year and a half after his alleged disability onset date. Plaintiff was never hospitalized for mental health issues. (Tr. 632). The fact that Plaintiff did not seek aggressive treatment from a mental health professional was a proper consideration. *See Roberts v. Patel*, 222 F.3d 466, 469 (8th Cir. 2000) (finding that "[t]he absence of any evidence of ongoing counseling of psychiatric treatment or of deterioration" weighed against a finding of disability); *Vanlue v. Astrue*, No.

4:11CV595 TIA, 2012 WL 4464797, at *12 (E.D. Mo. Sept. 26, 2012) (affirming the ALJ's finding that depression was not a severe impairment where the plaintiff had sought only minimal and conservative treatment and the claimant never required more aggressive forms of mental health treatment than medication).

Furthermore, the undersigned finds no evidence of any cognitive impairment that significantly limits Plaintiff's ability to do work activities. Plaintiff did not mention a cognitive impairment in his disability application. (Tr. 209). The only medical evidence related to Plaintiff's cognitive impairment is a few notes by Dr. Ninichuck stating that Plaintiff had a "cognitive impairment" and a review of systems by a neurologist indicating "memory problems." (Tr. 401, 555-56, 603-04). However, there is no evidence that Plaintiff's physicians ever conducted any specific assessment of Plaintiff's cognitive abilities. In addition, Plaintiff's psychiatrist did not note a cognitive impairment or inability to focus or concentrate, and the consultative examiner found that Plaintiff's "recent and remote memory for medical events is good." (Tr. 609, 632-34). The isolated mentions of a cognitive impairment in the record, unsupported by any evidence, do not demonstrate the existence of a severe medically determinable impairment.

The ALJ's decision regarding Plaintiff's mental impairments is further supported by the opinion of nonexamining state agency psychologist Marsha Toll, who opined that Plaintiff's mental impairments of anxiety and depression were not severe and that his statements regarding his mental impairments were minimally credible because they were not supported by medical evidence. (Tr. 20, 410-20). Although Dr. Toll was a nonexamining source and thus her opinion was not entitled to great weight, it was proper for the ALJ to consider her opinion. 20 C.F.R. § 404.1527(c), (e)(2)(i).

In sum, the undersigned finds that there is substantial evidence supporting the ALJ's decision that Plaintiff's mental impairments were not severe.

## VI.    CONCLUSION

 For the reasons set forth above, the undersigned finds that substantial evidence on the record as a whole supports the Commissioner's decision that Plaintiff is not disabled.

Accordingly,

**IT IS HEREBY RECOMMENDED** that the final decision of the Commissioner denying social security benefits be **AFFIRMED**.

The parties are advised that they have 14 days to file written objections to this Report and Recommendation.  The failure to file timely written objections may waive the right to appeal issues of fact.


/s/Shirley Padmore Mensah
SHIRLEY PADMORE MENSAH
UNITED STATES MAGISTRATE JUDGE


Dated this 28th day of February, 2013.